# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

In the Matter of the Search of

APPLICATION & AFFIDAVIT
FOR SEARCH WARRANT
Case Number: 05-m05 6JUL19 19:21

**THE FOLLOWING PROPERTY:**
1600 E. Mason Street, Green Bay, WI; further described as a white 2-story, multi-unit bldg. The bldg. includes The Gun Room as well as a bar named USETOBE's and an apartment on the 2nd floor. The Gun Room is a single room FFL store front located on the east side of the bldg. and contains a front and rear entrance. "Gun Room" is painted on a window next to the front entrance.

**SEALED**

I, RICK HANKINS, being first duly sworn depose and state:

I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and have reason to believe that on the property or premises known as: **1600 E. Mason Street, Green Bay, WI; further described as a white 2-story, multi-unit bldg. The bldg. includes The Gun Room as well as a bar named USETOBE's and an apartment on the 2nd floor. The Gun Room is a single room FFL store front located on the east side of the bldg. and contains a front and rear entrance. "Gun Room" is painted on a window next to the front entrance.**
in the Eastern District of Wisconsin there is now concealed certain property, namely: **All records relating to violations of 18 U.S.C. § 922(b)(5), 18 U.S.C. § 922(d) and/or 18 U.S.C. § 924(a)(1)(A) including but not limited to the bound book, invoices, receipts, Form 4473, and information related to sales and purchases of firearms in any form (including names, addresses, phone numbers, shipping, packaging records or any other identifying information, all bank records, checks, credit card bills, account information, and other financial records); illegally possessed firearms including machine guns, destructive devices, and firearms not recorded in the bound book; U.S. currency in the form of pre-recorded serial numbers from CI purchases of firearms.**
which is: **evidence of the commission of crimes, contraband, or other items illegally possessed**, concerning violations of Title 18, United States Code, § 922(b)(5), 18 U.S.C. § 922(d) and/or 18 U.S.C. § 924(a)(1)(A).

The facts to support a finding of Probable Cause are as follows: **Please see attached affidavit.**

Continued on the attached sheet and made a part hereof. ✓ Yes ___ No

_____
Signature of Affiant: Rick Hankins

Sworn to before me, and subscribed in my presence

July 1/2005; 9:15 PM
Date and time issued

at Green Bay, Wisconsin
City and State

HONORABLE JAMES R. SICKEL
United States Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

RICK A. HANKINS, being duly sworn, deposes and states as follows:

1. I am a Special Agent of the United States Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed since April of 2003 and have two years employment prior to that as an Inspector with the United States Bureau of Alcohol, Tobacco, Firearms and Explosives. I am currently assigned to the Milwaukee Field Office where my duties consist of investigating violations of federal firearm laws including but not limited to the following: Title 18 U.S.C.§ 922(b)(5), 18 U.S.C.§ 922(d) and § 924(a)(1)(A).

2. During the course of my employment with ATF, I have participated in the execution of search warrants and seizure warrants secured by myself as an affiant and by other special agents of ATF. These warrants involved the search of locations ranging from residences and businesses to storage facilities. Evidence searched for, recovered, and seized in these locations have included firearms of all types including those illegal to possess under any circumstance, records pertaining to the previous purchase or sale of firearms, documents demonstrative of ownership of firearms.

3. I have also received training in the area of firearms investigation including at the ATF National Academy. This affidavit is derived from personal knowledge and observations, interviews of witnesses including other law enforcement officers, government records, and other third party records. To the extent that the information is not based upon my personal knowledge, I believe it to be truthful and reliable.

4. I submit this affidavit in support of an application for two search warrants. One warrant would authorize the search of a business called "The Gun Room" located at 1600 East Mason Street, Green Bay, Wisconsin while the second would authorize a search of the residence of Dale J. Bomske, located at 2057 Jamesford Avenue, Green Bay, Wisconsin. Such searches would be for evidence of a crime, and contraband contrary to 18 U.S.C. §§ 922(b)(5), 18 U.S.C. § 922(d) and 924(a)(1)(A) to-wit: all firearm records related to such violations; illegally possessed firearms including machine guns, destructive devices, and firearms not recorded in the bound book; and U.S. currency in the form of pre-recorded serial numbers from CI purchases of firearms.

## Statutes of Interest

5. I am aware of a number of federal statutes governing the activity of individuals possessing a federal firearm license (FFL). All individuals engaged in the business of selling firearms must by federal law possess a FFL. 18 U.S.C. § 922(b)(5), in conjunction with 27 C.F.R. 178.125, provides that an FFL dealer must maintain a "bound

book" detailing the name, age, and place or residence of an individual that purchases a firearm from him. A dealer, who disposes of a firearm within one year after transferring that firearm from his business inventory into his personal collection or if such disposition or any other acquisition is made for purposes of evading reporting requirements, must include that firearm as part of his business inventory and consequently is required to comply with any background checks on the potential buyer as well as record background information on that buyer pursuant to 18 U.S.C. § 923(c). A dealer who maintains a firearm as part of a personal collection for one year and who sells or otherwise disposes of that firearm shall record the description of the firearm in a bound volume containing the name and place of residence and date of birth of the transferee pursuant to 18 U.S.C. § 923(c). 18 U.S.C. § 924(a)(1)(A) prohibits the making of a false statement or representation with respect to information required to be kept in the records of an FFL. 18 U.S.C. § 922(d) prohibits any person from selling a firearm to a person prohibited from possessing a firearm as a result of meeting the statutory criteria.

6. I also am familiar with an ATF form entitled "Firearms Transaction Record," which is also known as an ATF Form 4473. This form is required to be completed pursuant to 27 CFR 178.124 by both the actual buyer and seller of the firearm when the firearm sale occurs. The form sets forth the name, address, and other identifying information about the transaction including a certification that the buyer is the true buyer (as opposed to a straw purchaser) and not prohibited under federal law from the ability to purchase the firearm. Such records must be kept for 20 years and if FFL goes out of business, such records must be submitted to ATF.

## Training and Experience

7. I have conducted in excess of 200 compliance inspections of gun dealers and have participated in excess of 50 criminal investigations involving the illegal trafficking of firearms.

8. I know from my training and experience, and in particular, through my experiences as a compliance agent with ATF, that FFL's can and do keep firearm related records at their residence as well as their business. Those involved in the illegal sale, distribution, or possession of firearms often keep records of the initial purchase or sale but may not record such in the official bound book as required by law. Evidence of such transactions often exist in the form of purchase invoices, financial documents such as checks, money orders or U.S. currency and original firearm packaging.

2

## Search and Seizure Of Computer And Computer-Related Equipment

9. I am also aware that FFL's can and do use a computer to purchase guns via the internet. Computers are also used by FFL's to keep records of such purchases. After a computer has been used to purchase firearms over the internet, I am aware that a computer forensic examination can reveal evidence of web sites visited, communications with those at the web site, purchases made including date, time, type of firearm and price charged. Based upon my training, experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

   a. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

   b. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

   c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable

3

of storing fifteen gigabytes of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

d.  Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a computer user can conceal an image or text in an image file in which the concealed image or text cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

## Investigative Information Supporting Seizure

10. A summary of my investigation leading to probable cause to search the above described premises can be summarized as follows: between June and September 2004, an ATF compliance inspection was conducted on the FFL licensee, D & S Sales, d.b.a. The Gun Room, a business operated by Dale J. Bomske. That compliance inspection revealed that Bomske had committed numerous record keeping violations. After that inspection, two different confidential informants provided information to me about gun sales made "off the books" by Bomske. The confidential informants, both of whom are prohibited from possessing firearms, corroborated this information by making controlled purchases of firearms that I believe were either not recorded as required by law or falsely recorded within his federal firearm record book. Therefore, Bomske has engaged in the business of selling firearms without completing the required paperwork as required under Title 18, U.S.C. §922(b)(5); has sold firearms to prohibited persons contrary to Title 18, U.S.C. §922(d); and has made a false entry in his records detailing firearm transactions contrary to Title 18, U.S.C. § 924(a)(1)(A).

A. Compliance Inspection

11. I am aware that a routine compliance inspection was conducted by an ATF inspector on the premises of FFL D & S Sales, Inc. d.b.a. The Gun Room, located at 1600 E. Mason Street, Green Bay, Wisconsin 54302 beginning on June 24, 2004. ATF Inspector Casimir Mleczko conducted that examination. I have spoke with Inspector Mleczko and have reviewed his report. Inspector Mleczko met with and interviewed the owner of that business, Dale Bomske. Bomske admitted to Inspector Mleczko that he did not properly record firearms that he received in his book. He also stated that a large part of his business was over the internet. One of his main suppliers was FFL Superpawn a.k.a. (Camco, Inc. Las Vegas, NV).[1] Inspector Mleczko asked Bomske for invoices of receipt regarding firearms acquired. Bomske stated that he had invoices but not at his business. Bomske was told that he did not have to keep the invoices at his business but was told to bring them in for review as part of the inspection. Bomske did so the following day, turning over several firearm receipts that he had kept at his residence. Ultimately, the inspection revealed that Bomske had a large number of firearms that were unrecorded in the acquisition/disposition record required to be accurately maintained by Bomske. He also failed to properly complete Forms 4473 or had accepted incomplete Forms 4473 from transferee's. These findings were reviewed with Bomske on September 22, 2004. Instructions were given regarding corrective action to be taken concerning the acquisition and disposition bound book record.

## B. Information from Confidential Informant

12. In December of 2004, I came in contact with a confidential informant (CI #1) that provided me information about an individual named Dale J. Bomske, DOB 2/16/50. In checking the ATF Industry Operations file, I learned that Bomske currently holds a federal firearms license and is listed as the corporate president of D&S Sales, a corporation that owns The Gun Room located at 1600 East Mason Street, Green Bay, Wisconsin. I am aware that the City of Green Bay is located in Brown County, State and Eastern District of Wisconsin.

13. Specifically, on December 29, 2004, CI#1 stated that he has bought several firearms from The Gun Room over the past year without completing any paperwork. CI#1 stated that the owner of The Gun Room, Dale Bomske, knows that CI#1 is a prohibited person. CI#1 stated that he is prohibited from possessing firearms because CI#1 was convicted in 2002 of a misdemeanor crime of domestic violence. I have been

---

[1] Superpawn, located at 1611 Las Vegas Blvd., North Las Vegas, Nevada, is a business that advertises and sells firearms on the Internet.

5

able to verify the accuracy of that information as I ran a record check on CI#1. CI#1 stated he first entered The Gun Room during the winter of 2003-2004. At that time, CI#1 stated he did not know that he was prohibited from purchasing or possessing firearms. Therefore, CI#1 attempted to purchase a Hi Point 40 caliber rifle by completing the required paperwork. After CI#1 completed the paperwork, Bomske, called for a background check on CI#1. CI#1 said Bomske told CI#1 to come back later because the firearm purchase had been delayed. Approximately 3 days later, Bomske contacted CI#1 and asked him to come back into The Gun Room. When CI#1 arrived, Bomske explained to CI#1 that his purchase of the Hi Point rifle had been denied. At that point, Bomske offered to sell CI#1 any other firearm in the store without paperwork. Bomske told CI#1 that he couldn't sell CI#1 the Hi Point rifle listed on the paperwork in case his store records were inspected. CI#1 stated that CI#1 purchased two pistols on that day from Bomske.

14. CI#1 stated that CI#1 purchased another pistol from Bomske after December 2004 for protection. CI#1 said it was a cheap pistol and CI#1 threw the pistol away in a dumpster next to an unknown building in Green Bay because CI#1 got nervous about getting into trouble for having it. CI#1 stated that Bomske pays other people to complete ATF Form 4473 for prohibited persons. CI#1 stated that Bomske is known on the streets of Green Bay as a gun dealer who will sell to gang members. CI#1 believes this information to be true since CI#1 provides the Asian gangs with firearms that he purchases at The Gun Room and at gun shows.

15. CI#1 further states that Bomske introduced CI#1 to another FFL that CI#1 knows only as Lance LNU at a gun show approximately 1½ years ago. CI#1 described Lance LNU as a short, chubby, white male with brown hair and glasses. CI#1 states he purchased two .25 caliber Raven pistols and two .38 caliber revolvers from Lance at their first meeting. CI#1 states CI#1 immediately sold the four aforementioned handguns to an Asian known only as "Cha Mang". CI#1 states that Bomske is aware that CI#1 sells the purchased firearms to Asian gang members.

16. CI#1 stated that Bomske has told CI#1 that he pays other people to help falsify his FFL records when he sells to prohibited people. CI#1 states that Bomske has about three people he pays to complete ATF F 4473 for firearms that have previously been transferred to a prohibited person and are no longer in inventory. CI#1 stated that Bomske told CI#1 that Lance LNU is one person he pays to falsify his firearm records.

17. CI#1 stated CI#1 typically enters The Gun Room and identifies which handgun CI#1 wants to purchase by locating it in the showcase and asking to handle it. CI#1 then gives the handgun back to Bomske and places money on the counter.

According to CI#1, Bomske picks up his money and then places the handgun in a bag/box and gives it back to CI#1. CI#1 states that Bomske sometimes tells the CI to come back if there are too many people in The Gun Room. CI#1 stated that CI#1 sometimes places orders with Bomske for 15-20 handguns at a time. CI#1 said the handguns are then sold to Asian gang members who ship them to the Twin Cities and Milwaukee.

18. On December 29, 2004, CI#1 showed me and SA DeValkenaere a .380 pistol in CI#1's possession that CI#1 recently purchased from The Gun Room. I examined the firearm and found it to be a .380 caliber pistol. I seized that firearm. I later traced that firearm through phone interviews and discovered it had been shipped to Bomske in October 2004 by FFL David Nunn, Wolfe City, Texas, through Gunbroker.com, an internet site devoted to firearm transactions.

C. December 29, 2004, Purchase of Smith & Wesson by CI#1

19. On December 29, 2004, at approximately 11:50 a.m., I along with another agent from ATF obtained volunteer consent to place an electronic listening and recording device on CI#1. On this same date, I searched CI#1's person and CI#1's vehicle, for firearms with a negative result. Immediately following the search of the vehicle, ATF Special Agent DeValkenaere activated the electronic recording device placed on CI#1's person. I issued CI#1 $450.00 in pre-recorded money for the purpose of purchasing a firearm.

20. I, along with SA DeValkenaere and ATF Officer Lauda followed CI#1 from CI#1s residence to The Gun Room. Approximately 12:14 p.m., CI#1 entered The Gun Room. Brown County Narcotics Investigator Dan Yantes video recorded CI#1s arrival and departure at The Gun Room. When CI#1 entered The Gun Room, he asked Bomske how "the show" was. Bomske replied "the show was good." Approximately 1 minute later CI#1 told Bomske "I'll be right back" and exited The Gun Room. I observed CI#1 retrieve something small from his vehicle and immediately reentered The Gun Room. CI#1 later informed me that he had left his wallet in the Ford Fiero.

21. Upon CI#1s re-entry into The Gun Room, CI#1 asked Bomske to see a mini-9mm pistol in the showcase. CI#1 was allowed to handle it. CI#1 later asked to see a Smith & Wesson pistol from the showcase and was allowed to handle it. CI#1 asked Bomske how much he could re-sell the Smith & Wesson pistol for and Bomske replied "between $500-$600" because it's "high capacity". CI#1 later said that the Smith & Wesson 9mm pistol was listed for $299.00, and CI#1 offered $350.00. Bomske agreed to sell it for $350.00. At approximately 12:19 p.m., an elderly man entered The Gun Room

7

with a long gun case. When CI#1 saw the elderly man approaching the store he said, "uh-oh, your buddy's here" and asked Bomske if he should come back later. Bomske replied, "no, he's going to be here for awhile." CI#1 put the $350.00 on the counter and Bomske picked it up. Before the elderly man entered the store, CI#1 said to Bomske "just act like you have paperwork right in front of me," to which Bomske replied, "just don't say anything." Immediately before the elderly man entered The Gun Room, CI#1 said "I'm going to need an order pretty soon after I get rid of this." Bomske acknowledged the request by nodding and making an affirmative sound. After the elderly man entered, CI#1 said "and I already paid you for the forms to the other people", to which Bomske replied, "okay." CI#1 stated Bomske placed the Smith & Wesson pistol in a box and handed it to him after writing the pistol's serial number on a business card. CI#1 stated he did not complete any paperwork or sign anything when he purchased the Smith & Wesson pistol. I observed CI#1 exit The Gun Room carrying a white package (bag/box). I turned off the recording device on CI#1's person and took the audio cassette into custody. At approximately 12:35 p.m., I accessed the Ford Fiero's trunk and located a United States Postal Service white box sealed. Inside the box, I located a Smith & Wesson 9mm pistol, Model SW9F, #PAE6973, with a 17-round magazine clip. I also retrieved $100.00 of the prerecorded money issued to CI#1.

### D. April 12, 2005, Purchase of a Hi-Point pistol by CI 150.

22. On April 12, 2005, at approximately 2:15 p.m., CI#1 traveled to The Gun Room, along with another confidential informant CI 150, in order to attempt to purchase a firearm from Dale Bomske, the owner and operator of The Gun Room. I observed CI 150 and CI#1 enter The Gun Room at approximately 2:25 p.m. I observed CI 150 and CI#1 exiting The Gun Room at approximately 2:37 p.m. because Bomske was busy with other customers.

23. At approximately 3:29 p.m., I observed CI 150 and CI#1 again enter The Gun Room. CI 150 and CI#1 asked Bomske the cost for a Hi-Point 9mm pistol that was located on the bottom shelf of Bomske's left glass gun case. There was a tag with a sale price of $150.00 on the Hi-Point pistol, but Bomske said it would cost $200.00. CI 150 agreed to pay Bomske the $200.00. CI#1 asked Bomske to see the Hi-Point pistol. CI 150 and CI#1 later said Bomske placed the Hi-Point pistol on the counter and CI#1 picked it up. CI#1 then handed the Hi-Point pistol to CI 150. After CI 150 handled the Hi-Point pistol, CI 150 placed it back on the counter while CI 150 retrieved money from CI 150's pocket. CI 150 counted out $200.00 of prerecorded ATF currency and placed the money on the counter. CI 150 stated Bomske picked up the money, counted it and then placed the $200.00 in a metal box in a drawer behind the glass counter. CI 150 and CI#1 stated that after Bomske counted the currency, he placed the Hi-Point pistol in a

8

white bag and placed the white bag on the counter. CI 150 stated CI 150 picked up the white bag. CI 150 and CI #1 stated Bomske did not require either of the confidential informants to complete any paperwork or show identification. Upon CI 150 and CI #1 exiting The Gun Room, Bomske said to CI 150, "if you do anything, throw it away."

### E. April 19, 2005 Purchase of a Smith & Wesson Revolver by CI150.

24. On April 19, 2005, I and Special Agent Handy of ATF placed an electronic recording device on CI 150 and searched CI 150 for contraband, with negative results. I instructed CI 150 to enter The Gun Room in an attempt to purchase a firearm from Bomske.

25. I observed CI 150 enter The Gun Room. SA Handy video recorded CI 150 entering The Gun Room. CI 150 asked Bomske where all of the .380 caliber pistols were that CI 150 saw in the store on April 12. Bomske replied he had sold 22 handguns and one shotgun at a gun show in Oshkosh on the past Saturday and Sunday. I later learned from CI 150 that there were approximately 10 handguns in The Gun Room on April 19th, compared to approximately 30-40 that CI 150 saw on April 12th.

26. CI 150 asked to look at the .25 caliber pistols that were located in Bomske's glass gun case. As CI 150 was handling one of the pistols, Bomske said, "The only problem I have with the .25s is that they're on the books." CI 150 later asked to see a .38 caliber revolver located in the glass gun case. After handling the .38 caliber revolver, CI 150 asked Bomske how much the revolver would cost. Bomske replied he really didn't want to do it unless CI #1 was there since he didn't really know CI 150. CI 150 explained to Bomske that CI #1 couldn't come to Green Bay because he was working in Milwaukee. Bomske stated to CI 150 that he would have to get $50.00 more than what the gun is listed for since he ran it through the "other guy and his CR license", and that was what Bomske did with the last one. Bomske also asked CI 150 if he was "with the government" meaning working as an agent with law enforcement. CI 150 denied being so affiliated. Bomske then began to explain his relationship with CI #1 stating that he and CI #1 had a "pact" that started a long time ago wherein if CI #1 was caught with any of the guns, CI #1 should say the guns came from a gun show. CI 150 told Bomske that CI #1 had already informed CI 150 about the "pact". Bomske replied "okay". Bomske said CI 150 should tell them "hey, I bought it at a gun show" because Bomske knew CI 150 lived in Milwaukee and there are a lot of gun shows in Milwaukee.

27. Bomske explained to CI 150 that most of the guns he sold over the weekend were guns that were out of his safe/vault that didn't have to go through the books or firearms he had received on consignment/trade-ins which didn't go into the books and

9

went right to the gun show.

28. Bomske stated that he saw CI #1 at a gun show after CI#1 had failed a background check that Bomske submitted. At the gun show, CI#1 approached Bomske and said he saw some of Bomske's guns on another dealer's table at the gun show. Bomske indicated he transferred 4-5 guns to his "dealer buddy" earlier at that gun show and that his buddy asked him (Bomske) about CI#1. Bomske stated he vouched for CI#1 and that his buddy then sold CI#1 two firearms and, later at the same gun show, Bomske said he transferred two more guns to CI#1. Thereafter, Bomske told CI 150 that CI#1 would come into The Gun Room when there were other people there and ask if his paperwork was done. Bomske would say "yes" and then would package the firearms for CI#1.

29. Bomske stated that CI#1 would come in to his store before gun shows subsequent to the gun show described above. Bomske stated the he called his guy from the shows and said remember the guy who bought two guns from you, he wants another and if you do it, its another $50 dollars in your pocket. After CI#1 would purchase a gun or two, Bomske stated he "will see Lance tomorrow and will tell him what numbers sold ..." Bomske stated that CI#1 is "the only one I am doing it with."

30. CI 150 stated that the .38 caliber revolver had remained on the counter while CI 150 talked with Bomske. CI 150 stated Bomske finally gestured to the .38 caliber revolver and said he would take $350.00 for it, which was $50.00 more than the listed price. CI 150 then counted out $350.00 and handed the money to Bomske. Bomske then taped the .38 caliber revolver in bubble wrap and placed it in a white plastic bag and gave it to CI 150. CI 150 stated neither he nor Bomske filled out any paperwork in association with the sale of the firearm. Prior to exiting The Gun Room, CI 150 told Bomske CI 150 would be back in about a month. CI 150 told Bomske that CI 150 liked a Glock Model 21 Bomske had in his glass gun case. Bomske replied, "that one's off the books."

31. I observed CI 150 exit The Gun Room carrying a white bag. SA Handy video taped CI 150 exiting The Gun Room carrying the white bag. A few minutes later I took custody of the recording equipment that was placed on CI 150 and the white plastic bag CI 150 carried out of The Gun Room. Inside the white plastic bag was an item taped in bubble wrap. Inside the bubble wrap was a Smith & Wesson .38 caliber revolver, model 49, s/n 9J8134.

32. Based on my review of the conversation between Bomske and CI 150, I believe that Bomske has transferred firearms to a prohibited person and falsified his FFL records with the knowing help of his "C & R buddy" Lance LNU. I believe Bomske

10

forwarded firearm descriptions to Lance LNU regarding firearms Bomske has illegally sold so that Lance LNU's records falsely reflect the receipt of those firearms.

## F. Reliability of Confidential Informants.

33. I believe the information provided by CI#1 is truthful and reliable as (1) CI#1 has made a "controlled purchase" of a firearm from Bomske wherein Bomske sold the firearm in violation of federal law; (2) I have been able to corroborate information provided CI#1 about Bomske as being accurate through both recorded statements noted above made by Bomske as well as my own investigation; (3) the information supplied by CI#1 is truthful as it is derived from CI#1's personal observation; and (4) the information provided by CI#1 includes statements made against his own penal interest.

34. I believe the information provided by CI 150 is truthful and reliable as the information was almost entirely corroborated through the recorded statements of Bomske and/or through my own observations and investigation.

## G. Federal Firearm Record Violations

35. On April 6, 2005, I examined firearm records regarding firearms shipped from Superpawn, a gun distributor located in Las Vegas, Nevada to Bomske, d/b/a The Gun Room. The records show that Superpawn shipped Bomske the Smith & Wesson pistol in July 2004 that was later purchased by CI #1 under the direction of ATF. Thefefore, this firearm must be recorded in Bomske's bound book and if not, is in violation of 18 U.S.C. § 922(b)(1)(5) and 18 U.S.C. 924(9)(1)(A).

36. The Federal Firearms Licensee (FFL) file for Bomske indicates that The Gun Room was inspected in July 2004 by ATF Inspector Casimir Mleczko. ATF Inspector Mleczko cited Bomske for several violations, including not recording firearms on his premises into his FFL boundbook. Inspector Mleczko noted during his inspection that Bomski received several firearm shipments from Camco, Inc., d/b/a/Superpawn, FFL # 9-88-003-02-6E-00408, 4653 West Flamingo Road, Las Vegas, Nevada.

37. ATF Inspector Mleczko, thru the ATF Industry Operations office in Las Vegas, requested and obtained disposition records from Superpawn regarding firearm shipments made from Superpawn to Bomske. I examined the disposition records from Superpawn and I noted that Superpawn sold a Smith & Wesson 9mm pistol, model SW9F, serial number PAE6973, to Bomske on July 9, 2004. On 12/29/04, under the surveillance of ATF, that same pistol was purchased from Bomske by a prohibited ATF confidential source of information. Bomske did not require the ATF confidential source

11

of information to complete the required paperwork for the purchase of the Smith & Wesson pistol in violation of federal firearms laws.

38. On April 26, 2005, I obtained records from Federal Firearms Licensee David Nunn, d.b.a. Nunn's Guns, 8550 Highway 34 North, Wolfe City, Texas. The records show that Nunn shipped a used .380 caliber Davis Industries pistol, Model P380, s/n AP111072 to The Gun Room, 1600 East Mason Street, Green Bay, WI on October 21, 2004. On December 29, 2004, I recovered that Davis Industries pistol from CI#1 who is a prohibited person. CI#1 stated CI#1 purchased the Davis Industries pistol from Bomske at The Gun Room. I contacted David Nunn who stated he sold the pistol via GunBroker.com, an online gun broker service, to D&S Sales/The Gun Room in Green Bay, Wisconsin on October 21, 2004. David Nunn's username for GunBroker.com is "nunn." On April 23, 2004, I queried GunBroker.com regarding the completed auction for that Davis Industries pistol. I found a .380 caliber Davis Industries pistol, model P-380 listed for sale by "nunn" in October 2004. The parts gun was purchased by the username "daleyjoe" located in Green Bay, Wisconsin. I believe that "daleyjoe" is Dale Joseph Bomske based on the foregoing.

39. On May 4, 2005, I queried GunBroker.com for other transactions made by "daleyjoe" (Bomske). To date, Bomske has completed in excess of 30 transactions via GunBroker.com since October 2003. He has been the buyer in 18 of the transactions and the seller in 12 transactions. I reviewed 18 of Bomske's transactions via GunBroker.com, the remaining 12 transactions had already been purged from the website. Of the 18 transactions reviewed, I determined that Bomske had purchased 4 handguns, 4 long guns, 3 firearm parts, and one ammunition magazine. Bomske had sold 6 long guns using that service. I determined that most firearm descriptions on GunBroker.com do not include serial numbers. To date, the three known firearm parts Bomske has purchased on GunBroker.com are a Remington, Model 12, bolt; a .22 caliber Winchester, Model 51, extractor/upper receiver; and a .380 caliber Davis Industries Model P-380, pistol frame. The Davis Industries pistol frame has been fully assembled and subsequently recovered by ATF.

Probable Cause as to Bomske's business located at 1600 E. Mason St. Green Bay, WI.

40. Based on the foregoing information, I believe Bomske maintains illegally possessed firearms and firearm records at his business named "The Gun Room" located at 1600 East Mason Street, Green Bay, Wisconsin. Those records include but are not limited to the bound book, ATF Form 4473's, invoices, other firearm information, firearms illegally possessed and U.S. currency.

12

### Probable Cause as to Bomske's residence located at 2057 Jamesford Ave., Green Bay, WI.

41. I am aware the Bomske's home address is 2057 Jamesford Ave., Green Bay, WI. That is the address currently represented by Bomske on federal firearms paperwork as his residence. As noted above, I am aware that Bomske has used that address to store federal firearms paperwork as during the June through September 2004 inspection. Bomske told the inspector that some of his paperwork was kept at his residence. Further, I know from reviewing records maintained by SuperPawn that Bomske has had firearms that he has purchased from that company shipped to that address. When queried last in April 2005, Superpawn reported shipping a rifle and pistol to Bomske at his home on April 11, 2005. From reviewing records of the ATF inspection, I am also aware that between September 25, 2003 and August 24, 2004, approximately 59 firearms were shipped by SuperPawn to D & S Sales Gun Room, 2057 Jamesford Ave, Green Bay, WI. On 7/18/05, I called Superpawn and inquired as to the last transaction engaged in by Bomske. I learned that on 7/06/05, a firearm was shipped to Bomske at the address 2057 Jamesford Avenue, Green Bay, Wisconsin. I am also aware that on September 10, 2003, two Jennings model 522 .22 caliber pistols were sent by Freetrappers Muzzleloading to his residence located at 2057 Jamesford Ave, Green Bay, WI.

42. I believe the computer used to purchase some of those firearms is located at Bomske's residence and that the computer contains evidence of a crime in the form of records of on-line gun purchases from corporations or private individuals. I believe some are not documented by Bomske within his bound book. On July 7, 2005, I made a telephone call to number 920-468-5865, which I believe to be Bomske's home telephone number. The male who answered the telephone stated he had Internet service at his residence. In light of the above referenced concerns regarding the difficulty of an on-site computer forensic examination, your affiant hereby requests the Court's permission to seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the computer hardware on-site for this evidence.

43. I believe Bomske maintains a gun safe at his residence based on a recorded conversation in which Bomske told CI 150 that on April 19, 2005, he stored firearms in a gun safe. Inspector Mleczko told me he did not see any gun safes at the business location. Therefore, I believe the gun safe to be at Bomske's residence at 2057 Jamesford Avenue, Green Bay, Wi.

44. I am further aware that Bomske has a vehicle described as a red, 1991 Dodge minivan with license plate number WI PPB284. That vehicle is registered to Bomske at the address 2057 Jamesford Ave. Green Bay, Wisconsin. On July 8, 2005, I observed that vehicle registered to Bomske in the driveway of 2057 Jamesford Ave. Green Bay, Wisconsin.

## Conclusion and Recommendations

45. Based on the foregoing facts and circumstances, I believe there is probable cause to believe that at the premises located at The Gun Room located at 1600 East Mason Street, Green Bay, Wisconsin and the residence located at 2057 Jamesford Avenue, Green Bay, Wisconsin there are Federal Firearm Licensee records and or firearms which constitute evidence of a crime, in violation of 18 U.S.C. § 922(b)(5), §922(d) and § 924(a)(1)(A).

## Items to be Seized

1. All records relating to violations of 18 U.S.C. § 922(b)(5), 18 U.S.C. § 922(d) and/or 18 U.S.C. § 924(a)(1)(A) including but not limited to the bound book, invoices, receipts, Form 4473, and information related to sales and purchases of firearms in any form (including names, addresses, phone numbers, shipping, packaging records or any other identifying information, all bank records, checks, credit card bills, account information, and other financial records). The terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device including floppy diskettes, hard disks, ZIP disks, CD-ROMs, memory calculators, pagers, personal digital assistants such as Palm Pilot computers, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

2. Illegally possessed firearms including machine guns, destructive devices, and firearms not recorded in the bound book.

3. U.S. currency in the form of pre-recorded serial numbers from CI purchases of firearms.

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

*In the Matter of the Search of*

**THE FOLLOWING PROPERTY:**
1600 E. Mason Street, Green Bay, WI;
further described as a white 2-story, multi-unit bldg. The bldg. includes The Gun Room as well as a bar named USETOBE's and an apartment on the 2nd floor. The Gun Room is a single room FFL store front located on the east side of the bldg. and contains a front and rear entrance. "Gun Room" is painted on a window next to the front entrance.

**SEARCH WARRANT**
Case Number: 05-m-626

**TO: Any authorized officer of the United States:**

Affidavit having been made before me by Special Agent RICK HANKINS, Alcohol, Tobacco, Firearms, and Explosives, who has reason to believe that on the properties known as: **1600 E. Mason Street, Green Bay, WI; further described as a white 2-story, multi-unit bldg. The bldg. includes The Gun Room as well as a bar named USETOBE's and an apartment on the 2nd floor. The Gun Room is a single room FFL store front located on the east side of the bldg. and contains a front and rear entrance. "Gun Room" is painted on a window next to the front entrance.**
in the Eastern District of Wisconsin there is now concealed certain property, namely: **All records relating to violations of 18 U.S.C. § 922(b)(5), 18 U.S.C. § 922(d) and/or 18 U.S.C. § 924(a)(1)(A) including but not limited to the bound book, invoices, receipts, Form 4473, and information related to sales and purchases of firearms in any form (including names, addresses, phone numbers, shipping, packaging records or any other identifying information, all bank records, checks, credit card bills, account information, and other financial records); illegally possessed firearms including machine guns, destructive devices, and firearms not recorded in the bound book; U.S. currency in the form of pre-recorded serial numbers from CI purchases of firearms.**

I am satisfied that the affidavit establishes probable cause to believe that the property so described is now concealed on the premises above-described and establishes grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before _____July 29_____, 2005_____
                                                                                                        Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime - 6:00 a.m. to 10:00 p.m.)(at any time in the day as I find reasonable cause has been established) and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to ***James R. Sickel U.S. Magistrate Judge*** as required by law.

July 19 2005; 9:15 (p.m.)                     at Green Bay, Wisconsin
Date and time issued                                             City and State

THE HONORABLE JAMES R. SICKEL
United States Magistrate Judge
Name & Title of Judicial Officer                Signature of Judicial Officer